UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
SOUTH BEND DIVISION

MOSES GIGER,

               Petitioner,

               v.                                 CAUSE NO.: 3:17-CV-262-JD-MGG

WARDEN,

               Respondent.

OPINION AND ORDER

Moses Giger, a prisoner without a lawyer, filed a habeas corpus petition to challenge his conviction and sentence for murder under Case No. 71D03-202-MR-2. Following a jury trial, on May 15, 2003, the St. Joseph County Superior Court sentenced Giger to sixty-five years of incarceration.

FACTUAL BACKGROUND

In deciding this habeas petition, the court must presume the facts set forth by the state courts are correct unless they are rebutted with clear and convincing evidence. 28 U.S.C. § 2254(e)(1). The Court of Appeals of Indiana summarized the evidence presented at trial:

> On February 2, 2002, Giger went to the home of his neighbor, Angela Husband. Husband was a prostitute and Giger paid her regularly with either money or drugs for sexual services. When Giger arrived at Husband's, he had only a small amount of crack cocaine and told Husband he would return later if he could get more cocaine with which to pay her.
>
> Giger called James Thorpe (also known as "Cash"), a drug dealer with whom Giger had regular contact and from whom Giger had purchased

drugs within the preceding week. Thorpe asked Giger to drive him somewhere and Giger picked him up. Giger drove Thorpe to a residence. Giger remained in the car while Thorpe exited, presumably to approach the house. Thorpe took Giger's keys with him to make sure that Giger would not leave him stranded at the house. Giger, in turn, held some of Thorpe's drugs to make sure Thorpe would return. Giger claims he saw Thorpe running down the street and Giger chased him because Thorpe had Giger's car keys. Giger claims that he fell while chasing Thorpe. After falling, Giger saw a knife on the ground and picked it up. He claims that he found Thorpe's body a few feet from the knife and was unable to rouse him.

Giger took the knife with him and drove home. He left the knife by the front door. After noting that he had blood on his hands and pants, he washed his hands and changed his pants. He later returned to Husband's house with a handful of cocaine packets. Giger, Husband, and Husband's mother consumed the cocaine. After the cocaine was consumed, Giger left and returned with more drugs.

Thorpe's body was found in a pool of his blood on the morning of February 3 at the corner of College and Sibley Streets in South Bend. Thorpe had been stabbed twenty-one times with a knife, puncturing both lungs, his aorta, and damaging his heart. The wounds included several stabs to his back, stabs to his arms suggesting defensive wounds and a cluster of stab wounds to the chest at least two of which the pathologist classified as perimortem or postmortem wounds.

Husband contacted the South Bend police stating that she believed Giger may have killed Thorpe. The police recovered several items from Giger's home including the knife and two pairs of Giger's jeans. Thorpe's blood was found on Giger's car, jeans, left shoe, and on the knife. Police officers also recovered $359.95 in blood-covered currency in Giger's possession. The State performed DNA testing on items taken from Giger as well as items recovered from the crime scene. The only recovered DNA inconsistent with Giger or Thorpe was from the headband of Thorpe's baseball cap and the outside of Thorpe's pockets.

On February 5, Giger was charged with murder. While in prison, Giger told another inmate that he had killed Thorpe and asked for advice because he had heard that the inmate previously beat an attempted murder charge. At trial, the inmate testified against Giger. A jury found Giger guilty of murder.

2

ECF 9-5 at 2-4.

Giger argues that he is entitled to habeas corpus relief. He asserts that he received ineffective assistance of trial and appellate counsel on numerous grounds.

## PROCEDURAL DEFAULT

Before considering the merits of a habeas petition, the court must ensure that the petitioner has exhausted all available remedies in state court. 28 U.S.C. § 2254(b)(1)(A); *Lewis v. Sternes*, 390 F.3d 1019, 1025 (7th Cir. 2004). For a federal court to hear his or her claims, a habeas petitioner must have fully and fairly presented his or her federal claims to the state courts. *Boyko v. Parke*, 259 F.3d 781, 788 (7th Cir. 2001). Fair presentment "does not require a hypertechnical congruence between the claims made in the federal and state courts; it merely requires that the factual and legal substance remain the same." *Anderson v. Brevik*, 471 F.3d 811, 814–15 (7th Cir. 2006) (citing *Boyko*, 259 F.3d at 788). It does, however, require "the petitioner to assert his federal claim through one complete round of state-court review, either on direct appeal of his conviction or in post-conviction proceeding." *Lewis*, 390 F.3d at 1025. "This means that the petitioner must raise the issue at each and every level in the state court system, including levels at which review is discretionary rather than mandatory. *Id.*

Giger presented his claims that he received ineffective assistance of trial counsel with respect to: (1) a conflict of interest with Demetric Johnson; (2) the investigation and cross-examination of Angela Husband, George Greene; Mario Stewart, Adrian Vanison, and Rebecca Tobey; (3) the admission of his interview of the police; (4) the jury instructions; and (5) the cumulative effect of trial counsel error to the Court of Appeals

3

of Indiana and the Indiana Supreme Court at the post-conviction relief stage. ECF 9-8; ECF 9-12. However, Giger did not present any other claim to the Indiana Supreme Court. Therefore, Giger has procedurally defaulted his remaining ineffective assistance of counsel claims.

A habeas petitioner can overcome a procedural default by showing both cause for failing to abide by state procedural rules and a resulting prejudice from that failure. *Wainwright v. Sykes*, 433 U.S. 72, 90 (1977); *Wrinkles v. Buss*, 537 F.3d 804, 812 (7th Cir. 2008), *cert. denied*, 129 S. Ct. 2382 (2009). Cause sufficient to excuse procedural default is defined as "some objective factor external to the defense" which prevented a petitioner from pursuing his constitutional claim in state court. *Murray v. Carrier*, 477 U.S. 478, 492 (1986).

To excuse procedural bar, Giger asserts that he had ineffective assistance of counsel during the post-conviction relief stage. As a general rule, "[n]egligence on the part of a prisoner's postconviction attorney does not qualify as cause." *Maples v. Thomas*, 565 U.S. 266, 280 (2012). An exception to this rule is that "[i]nadequate assistance of counsel at initial-review collateral proceedings may establish cause for a prisoner's procedural default of a claim of ineffective assistance at trial." *Martinez v. Ryan*, 566 U.S. 1, 9 (2012); *Brown v. Brown*, 847 F.3d 502 (7th Cir. 2017). The narrow *Martinez* exception does not apply to "attorney errors in other kinds of proceedings, including appeals from initial-review collateral proceedings, second or successive collateral proceedings, and petitions for discretionary review in a State's appellate courts." *Martinez*, 566 U.S. at 16. Giger's claims regarding appellate counsel and the claims presented to the St. Joseph

Circuit Court but abandoned on appeal do not qualify under the *Martinez* exception, and the court will not further consider them. However, Giger's claims asserting that trial counsel failed to challenge false evidence and to timely depose witnesses were not presented to the St. Joseph Circuit Court and thus may qualify, so the court will consider below whether post-conviction counsel provided ineffective assistance by declining to present them.

<u>ANALYSIS</u>

In the habeas petition, Giger asserts that the State court erred by denying him post-conviction relief on his claims of ineffective assistance of trial counsel. "Federal habeas review exists as a guard against extreme malfunctions in the state criminal justice systems, not a substitute for ordinary error correction through appeal." *Woods v. Donald*, 135 S.Ct. 1372, 1376 (2015) (quotations and citation omitted).

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim—
> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

> [This] standard is intentionally difficult to meet. We have explained that clearly established Federal law for purposes of §2254(d)(1) includes only the holdings, as opposed to the dicta, of this Court's decisions. And an unreasonable application of those holdings must be objectively unreasonable, not merely wrong; even clear error will not suffice. To satisfy this high bar, a habeas petitioner is required to show that the state

> court's ruling on the claim being presented in federal court was so lacking
> in justification that there was an error well understood and
> comprehended in existing law beyond any possibility for fairminded
> disagreement.

*Woods,* 135 S. Ct. at 1376 (quotation marks and citations omitted). Criminal defendants

are entitled to a fair trial but not a perfect one. *Rose v. Clark*, 478 U.S. 570, 579 (1986). To

warrant relief, a state court's decision must be more than incorrect or erroneous; it must

be objectively unreasonable. *Wiggins v. Smith*, 539 U.S. 510, 520 (2003). "A state court's

determination that a claim lacks merit precludes federal habeas relief so long as

fairminded jurists could disagree on the correctness of the state court's decision."

*Harrington v. Richter*, 562 U.S. 86, 101 (2011) (quotation marks omitted).

On February 5, 2002, the prosecution charged Giger with murder. Direct Appeal

App. 6. On March 18, 2003, the jury trial commenced. Trial Tr. 1, 7. The prosecution

presented numerous witnesses, including George Green, who testified that he found the

body of the victim at the corner of College and Sibley on at around 8:00 a.m.[1] on

February 3, 2002. Trial Tr. 323-26. He spent the night nearby at his sister's house at 1808

Florence ("Jackson residence") but left the residence on or around 2:15 a.m. to purchase

cocaine for himself and his girlfriend, Demetric Johnson. *Id.* at 301, 308-19. He received

a ride from a stranger passing through the neighborhood and returned with cocaine but

also with soiled pants due to his inability to reach a toilet in time. *Id.* Green and Johnson

consumed the cocaine, and, later in the early morning, Green left the Jackson residence

---

[1] Throughout the trial, many of the fact witnesses, including Green, Johnson, and Husband, struggled with their recollection specific times but offered broad estimates.

6

again for more and for a change of clothes at his residence at 1121 Campeau ("Green residence"), about three miles away. *Id.* at 318-23. As he walked back to the Jackson residence, he discovered the victim's body and called emergency services from the victim's cellphone. *Id.* at 323-26.

The prosecution also presented Johnson, who corroborated Green's account that they stayed at the Jackson residence on the night of the incident and that Green left the residence twice in the early morning to buy cocaine. *Id.* at 415, 423-27. She also testified that, after the police had arrived in the neighborhood to investigate, she discovered blood, down feathers, and a blue baseball cap in the back yard of the Jackson residence and informed the police. *Id.* at 428-31.

Ronald Nowicki, a crime scene technician, testified that, upon his arrival at the corner of College and Sibley, he observed the victim laying face up in a puddle of blood near a cellphone and a dark, blood-stained down jacket. *Id.* at 511. After speaking with Johnson, he also observed blood and down feathers scattered in the backyard of the Jackson residence. *Id.* at 522-23. He found the telephone number for 1613 Florence ("Giger residence"), where Giger lived, on the victim's cellphone as one of the last incoming calls at 2:10 a.m. *Id.* at 541-43. Nowicki discovered blood on the inside and outside of the driver-side door on the blue Cadillac parked in front of that residence. 547-50. He found a knife inside the residence, which Giger's niece had moved from the flowerbed that morning. *Id.* at 568-69. He found a pair of blue jeans with blood stains on the knees in Giger's bedroom. *Id.* at 571-72. He obtained a white sneaker with blood stains and $359.95 in blood-stained cash from Giger at about noon on February 4. *Id.* at

572-73. He found a pair of blue jeans at the Green residence with defecation but no other apparent signs of bodily substances. *Id.* at 581-82.

Angela Husband testified that she lived at 1607 Florence ("Husband residence") and that she maintained a transactional relationship with Giger in which she would provide sexual services in exchange for money or cocaine. *Id.* at 632. He had conveyed his interest in pursuing a romantic relationship with her, but she did not reciprocate.[2] *Id.* at 649-50. She observed Giger buy cocaine from the victim occasionally. *Id.* at 632-33. The victim allowed Giger to buy cocaine on credit until Giger decided to stop paying his debts. *Id.* About one week before the incident, she observed a meeting between the victim and Giger near Giger's garage in which the victim refused him credit. *Id.* at 636-39. At about 10:00 p.m., on the night of the incident, Giger arrived at the Husband residence. *Id.* at 641. He did not have enough cocaine or money to pay Husband but told her that he would try to get more and then return. *Id.* at 642-44. At around 2:00 a.m., Giger returned to the Husband residence with a handful of small bags of cocaine, appearing sweaty and out of breath. *Id.* at 650-53. As they consumed cocaine in her mother's bedroom, she observed Giger staring at the door as though he were anticipating something. *Id.* at 656-57. Husband and Giger went to her bedroom briefly, where she noticed scratches on his hand and that he got blood on her mattress. *Id.* at 664-65. On two occasions, he left and quickly came back with more cocaine, which she

---

[2] Husband's mother also testified, stating that Giger cared about Husband and that he expressed that his feelings were hurt because "he was there . . . to see her" and "she wasn't exactly being the best host one could be" that night. Trial Tr. 729-30.

believed he retrieved from his nearby home. *Id.* at 666-67. She left her residence at about 7:00 a.m. to meet another client. *Id.* at 664. Later that morning, she learned that the victim had died, suspected Giger's involvement, and contacted the police. *Id.* at 671-74.

Dr. Joseph Prahlow, a forensic psychologist, testified that the victim had been stabbed twenty-one times in the back, chest, and the arms, and had died as a result. *Id.* at 751-52 ,780-81. He testified that, some of the wounds on the chest had yellow discoloration, which suggested that they were incurred after or very shortly before the time of death. *Id.* at 760-64. The amount of blood on the chest suggested that those wounds were not incurred when the victim was standing or running. *Id.* at 778-79. The wounds on the forearms reflected the victim's efforts to defend himself. *Id.* at 780. Nicole Inhat, a forensic serologist, testified that she obtained DNA samples from Giger and the victim. *Id.* at 797-897. She gathered samples for DNA testing from the various articles of evidence gathered by Officer Nowicki and also tested them for the presence of blood. *Id.* Via video deposition, Rebecca Tobey, a forensic DNA analyst, testified that her testing revealed, with a reasonable degree of scientific certainty, the presence of the victim's DNA on Giger's jeans and shoe; and the presence of both the victim's and Giger's DNA on the knife. *Id.* at 918; PCR Ex. III. She also noted the presence of DNA that did not belong to the victim or Giger on the baseball cap and the front of the victim's pants pocket but found no other DNA that was not at least consistent with the victim or Giger. *Id.*

Sergeant John Ciesiolka, a homicide investigator, testified that, during the course of the investigation, he interviewed Green at the scene of the incident and observed no

indication that he was involved in a physical struggle, including injuries, scratches, torn clothes, or blood stains. Trial Tr. at 976-81. He interviewed Green at the police station later on the same day and took photographs of his face and hands, which did not show any scratches. *Id.* He also interviewed Giger, who conceded that he was with the victim near the time of the victim's death, represented that he had driven him to Burger King that night, but denied his involvement in the murder. *Id.* at 987-93; Trial Ex. 108.

John Griffin, the victim's cousin, testified that he spent considerable time with the victim prior to his death and was familiar with his habits and sales practices. Trial Tr. 1025, 1032-33. The victim sold to a certain group of people, including Giger and Husband, but did not sell to strangers. *Id.* The victim did not sell to Giger in the month preceding his death because Giger owed him money. *Id.* at 1034-35. On a few occasions, Giger drove the victim to Taco Bell, but the victim did not eat at Burger King because he was tired of the food after working there. *Id.* at 1037. On the day of the incident, the victim had moved into a new apartment at the corner of Huey and Orange. *Id.* at 1038-39. At around 1:00 a.m., Griffin left the victim at his apartment with Adrian Vanison, a friend of the victim. Vanison testified that he left the apartment a short time later with the victim's key because he intended to return and went to a nearby residence. *Id.* at 1100-01. Sometime later, the victim arrived at that residence, took the key from Vanison, and told him that he was going to sell cocaine "to a junkie he knew." *Id.* at 1126. He saw the victim lock his apartment and walk down the street. *Id.* at  1103-04.

The parties stipulated that Mario Stewart and Giger were located in the same part of the St. Joseph County Jail from March 12, 2002, to April 10, 2002. *Id.* at 1145-46.

Stewart testified that Giger sought legal advice from him during that time and told him that he bought counterfeit cocaine from the victim and that, when the victim refused to give him a refund, Giger grabbed a knife and started stabbing him. *Id.* at 1151-54. He told him that the victim cried as he stabbed him and that he intended to kill Husband because he knew she reported him to the police. *Id.* Stewart felt perturbed by the jovial, excited manner in which Giger told his story, which motivated him to report Giger to the police. *Id.* at 1148, 1154.

In his defense, Giger testified that he occasionally bought cocaine from the victim but saw him in the neighborhood daily. *Id.* at 1202-03. He considered the victim to be a friend and would occasionally drive the victim to restaurants or to conduct drug transactions. *Id.* He arrived at the Husband residence at about 9:00 p.m. on the night of the incident. *Id.* at 1204. Husband was his friend, and he would buy her cocaine to dissuade her from continuing to meet with other clients. *Id.* at 1201-02. He left to buy cigarettes and a glass pipe for Husband and to buy liquor and cocaine. *Id.* at 1208. He bought the liquor, glass pipe, and cigarettes. *Id.* at 1210. He went back home and then returned to the Husband residence. *Id.* at 1211. Husband was not there, but Giger consumed cocaine with Husband's mother. *Id.* At about 11:00 p.m., Husband returned, but Giger went home shortly thereafter because he did not have much cocaine left and because she had other company. *Id.* at 1212. He later decided that he wanted to go back to the Husband residence but that he needed more cocaine. *Id.* at 1212-13. At about 2:00 a.m., he called the victim, though he had not bought cocaine from him in three or four

months. *Id.* at 1213-15. During the call, the victim asked him to pick him up for a quick errand. *Id.*

Giger and the victim met at the corner of Huey and Orange. *Id.* at 1216. The victim told him that his key was stuck in the apartment door, so Giger removed it. *Id.* The victim asked him to drive to the Jackson residence for a drug transaction and to watch out for him and gave him two small packages of cocaine. *Id.* at 1220-24. He parked in the alley behind the house. *Id.* He told the victim that he wanted to move his vehicle from the alley to avoid police scrutiny. *Id.* He gave his car keys to the victim and saw him walk toward the side door, and Giger moved the vehicle to the front of the house on Florence Street.[3] *Id.*

As he waited and smoked more cocaine, he saw the victim running on College Street toward Sibley Street, where his relatives lived. *Id.* at 1224. He thought the victim was running from the police, though he did not see anybody in pursuit. *Id.* at 1225-26. He got out of the car and ran to find the victim and fell, scraping his hands and knee. *Id.* at 1226-27. He got up and continued walking toward the street corner. *Id.* As he approached the corner of College and Sibley, he became concerned for his safety. *Id.* at 1228. He searched for a weapon and found a knife, which he did not recognize as the murder weapon, on the ground and picked it up. *Id.* After a few more steps, Giger saw the victim on the ground. *Id.* at 1229. He did not immediately know that the victim was dead so he shook the victim to get him up. *Id.* After realizing that the victim was dead,

---

[3] Giger testified that the vehicle would continue to operate when he removed the key from the ignition but that he could not start the vehicle without it. Trial Tr. 1272-73.

he took his keys from the victim's pocket. *Id.* at 1230. He did not call the police because he did not trust them based on a past experience when he reported a murder. *Id.* He returned to his car and moved it to his residence. *Id.* at 1231-32. He dropped the knife outside the house to avoid alarming his mother. *Id.* at 1232-33.

He changed his pants and washed his hands. *Id.* at 1234-35. He went to the Husband residence to discuss what he had seen but changed his mind due to his uncertainty regarding the identity of the culprit. *Id.* at 1236. He brought cocaine that he had obtained before meeting with the victim. *Id.* at 1237. He went upstairs with Husband to her bedroom. *Id.* at 1238. They went back downstairs to smoke cocaine with her mother and went back to his house to get more cocaine. *Id.* at 1239. He left the Husband residence at about 9:00 a.m., and he left with his niece and sister for Chicago. *Id.* at 1239-41.

Giger also testified that he shared a pod with Stewart but did not discuss his case with him and that inmates at the St. Joseph County Jail learned about it from the newspaper. *Id.* at 1242-43. On cross-examination, the prosecution highlighted numerous inconsistencies from his police statement. In his initial statement, he represented that he saw the victim running on Florence toward College rather than just on College toward Sibley and that the victim did not trust him. *Id.* at 1249-52. In that statement, he suggested that he had injured his hands and knee by falling on the stairs at his house or by performing plumbing work. *Id.* at 1257-58. He had also conceded to the police that he was in love with Husband. *Id.* at 1259. During cross-examination, Giger maintained

he had ample cash at the time of the incident from work and that he never considered Husband to be more than a friend. *Id.* at 1244-63.

At closing, the prosecuting attorney argued that Giger had romantic interest in Husband but could not afford her sexual services, which he sought for his own gratification and to keep her away from other clients. *Id.* at 1289-1319; 1356-72. She argued that Giger met with the victim to obtain payment for Husband and that he stabbed the victim in the side and in the back in the backyard of the Jackson residence. He chased him to the corner of College and Sibley and continued to stab the victim until his death. He took the victim's cash and cocaine and returned to the Husband residence after cleaning himself up. He also removed the knife from the scene of the crime due to its incriminating nature.

Trial counsel argued that the prosecution based their case entirely on circumstantial evidence. *Id.* at 1319-56. He argued that the police investigation focused exclusively on Giger and on no other suspects. He argued that there was no evidence to corroborate Green's testimony regarding his whereabouts at the time of the murder. He noted Green's convictions for automobile theft and larceny as well as Johnson's testimony that she knew that sometimes he carried a knife. He noted that the police did not collect Green's DNA for testing and that the victim received two other telephone calls from unknown sources near the time of the murder. The jury deliberated and found Giger guilty of murder, and the Court of Appeals of Indiana affirmed the verdict on direct appeal. *Id.* at 1390; ECF 9-5.

<u>Conflict of Interest</u>

Giger argues that he is entitled to habeas relief because trial counsel was ineffective with respect to trial witness Demetric Johnson. He argues that trial counsel had a conflict of interest because she was his former client and that he failed to discredit her and to implicate her in the murder. "[A] defendant who raised no objection at trial must demonstrate that an actual conflict of interest adversely affected his lawyer's performance." *Cuyler v. Sullivan*, 446 U.S. 335, 348 (1980).

On February 13, 2002, trial counsel entered his appearance in Giger's criminal case. Direct Appeal App. 2. On May 21, 2002, trial counsel entered his appearance on behalf of Johnson in two unrelated criminal cases for forgery and theft. PCR Ex. P, Q. On November 20, 2002, four months before Giger's trial, Johnson entered guilty pleas in those cases, and trial counsel did not further represent her. PCR Ex. S, T. At the post-conviction stage, trial counsel testified that he informed Giger of his prior representation of Johnson but did not perceive it as a conflict because her testimony served to implicate Green as another suspect. PCR Tr. 231-32 For the same reason, it was not in his interest to discredit her at trial. *Id.* at 238-39, 348. Before trial, Johnson represented at her deposition that she was related to the victim, knew that he was a drug dealer, saw the victim frequently, including the previous night, and that he was a good person. Ex. R at 16-17. At trial, trial counsel introduced no evidence regarding Johnson's close relationship with the victim and did not otherwise suggest any prior connection. Trial counsel testified that he did not recall why he did not elicit such testimony from her at trial. PCR Tr. 237.

15

On appeal, the Court of Appeals of Indiana found that the prior representation of Johnson did not pose a conflict of interests because Johnson's cases were unrelated and ended long before trial and that the decision to use her testimony to implicate Green was a reasonably strategy. ECF 9-11 at 6-9. The appellate court also found that Giger suffered no adverse impact, reasoning that the record contained no evidence to suggest that Johnson was involved with the murder. *Id.* `

After reviewing the record, the court cannot conclude that the State court's determination with respect to the conflict of interest issue was objectively unreasonable. The record contains no evidence that trial counsel had a conflict of interests due to his prior representation of Johnson. Further, it is unclear how discrediting Johnson would have benefitted Giger at trial. Her testimony did not incriminate Giger; rather, the prosecution presented her as context for their investigation of the Jackson residence, and trial counsel used her testimony to further his theory that Green committed the murder. Nor is there compelling evidence to suggest that she participated in or was otherwise criminally responsible for murdering the victim. To the contrary, her deposition testimony indicated that she viewed her relationship with the victim as close and on good terms.

Giger argues that trial counsel had an ongoing duty of loyalty to Johnson, citing Rule 1.9 of the Indiana Rules of Professional Conduct:

> (a)   A lawyer who has formerly represented a client in a matter shall not thereafter represent another person in the same or a substantially related matter in which that person's interests are materially adverse to the interests of the former client unless the former client gives informed consent, confirmed in writing.

* * *

 (c)    A lawyer who has formerly represented a client in a matter or whose present or former firm has formerly represented a client in a matter shall not thereafter:

    (1)   use information relating to the representation to the disadvantage of the former client except as these Rules would permit or require with respect to a client, or when the information has become generally known; or

    (2)   reveal information relating to the representation except as these Rules would permit or require with respect to a client.

In light of these provisions, it is true that trial counsel had a limited duty of loyalty to Johnson at the time of Giger's trial, but the record does not suggest that this duty created a conflict of interests. Rule 1.9(a) does not apply because Johnson's criminal cases and Giger's criminal case were not substantially related. Similarly, Rule 1.9(c) does not apply because there is no indication that trial counsel obtained information from representing Johnson that would have been beneficial to Giger's defense.

Giger also cites to *Shepherd v. State*, 924 N.E.2d 1274 (Ind. Ct. App. 2010). In that case, trial counsel represented a State witness in a pending unrelated criminal case. *Id.* at 1286-87. The appellate court found a conflict of interest because trial counsel did not cross-examine the witness regarding controlled substances discovered in a house where she was present because it could have incriminated her. *Id.* at 1288. The court also noted that it was in the witness's best interest to provide testimony favorable to the prosecution given her tentative plea agreement. *Id.* This case is distinguishable from *Shepard* because the *Shepard* witness's criminal case remained pending, and counsel's

duty of loyalty with respect to current clients is significantly broader than it is for former clients. *See* Ind. Rules of Professional Conduct 1.7(a)(1) ("A concurrent conflict of interest exists if the representation of one client will be directly adverse to another client."). Stated otherwise, trial counsel was not prohibited from incriminating Johnson at Giger's trial unless it involved the use of information obtained during his representation of her, and there is no evidence to suggest that trial counsel had such information. Further, the outcome of Johnson's criminal cases could not have been affected by her testimony because these cases had concluded months before trial. Moreover, the prosecution elicited testimony regarding the nature of her convictions of these cases, and, even if they had not, trial counsel would not have been prohibited from doing so given that convictions are public information. *See* Ind. Rules of Professional Conduct 1.7(c)(1). Therefore, the claim that trial counsel had a conflict of interest with respect to Johnson is not a basis for habeas relief.

Investigation and Cross-Examination

Giger argues that he is entitled to habeas relief because trial counsel rendered ineffective assistance by failing to adequately investigate and cross-examine Husband, Green, Stewart, Vanison, and Tobey. In the amended habeas petition, his specific arguments include:

> With respect to Husband, trial counsel should have impeached her by noting that; (1) she did not discuss the victim's refusal to extend credit to Giger in her initial police statement; (2) she testified that the victim refused to extend credit to Giger about a month before his death at deposition; and (3) she testified that the victim refused to extend credit to Giger within a week of his death at trial.

18

Trial counsel also should have impeached Husband's testimony that she saw Thorpe walking across a field from inside Giger's garage through holes in the walls with evidence that the garage did not have holes in the walls at that time.

Trial counsel should have objected to Husband's testimony that crack "obviously" did not affect her ability to observe or recall relevant events because "[w]hen they investigated, the evidence was there" on the basis that it was a conclusion of guilt.

Trial counsel should have objected on the basis of hearsay to Husband's testimony that Giger could not afford her services on the night of the incident because, at deposition, she testified that she had heard that Giger was broke from a third party.

At her deposition, trial counsel should have asked Husband whether she was aware that her cousin had been arrested when she reported Giger to the police.

With respect to Green, trial counsel should have introduced his criminal conviction for an attempted assault with a knife from 1998.

With respect to Vanison, trial counsel should have impeached him by noting that; (1) he did not discuss watching the victim leaving his apartment in his initial police statement; (2) he testified that he watched the victim leave his apartment through the side window at deposition; and (3) he testified that he watched the victim through the backdoor at trial.

With respect to Stewart, trial counsel should not have stipulated that Stewart resided at the St. Joseph County Jail from March 12, 2002, to September 29, 2002, because he was held at the Laporte County Jail from April 11, 2002, to July 30, 2002.

Trial counsel also should have impeached Stewart's testimony that he did not hear or read anything about the case before meeting Giger by demonstrating that he had access to a newspaper article regarding his case.

With respect to Tobey, trial counsel should have deposed her about the presence of "possible alleles" that could not be attributed to Giger or the victim.

At the post-conviction stage, trial counsel testified that his strategy was to implicate Green as another suspect and that he did not seek to impeach witnesses on immaterial matters because doing so would have alienated the jury. 227-28, 405. Judge Jerome Frese, who presided over the trial and post-conviction proceedings, represented that he would not have admitted evidence of Green's prior conviction to demonstrate habit or the newspaper article regarding Giger's case due to its attenuated relevance. 391-94, 428-32. The post-conviction record included an affidavit from Tobey noting the presence of possible alleles not attributable to the victim or Giger but also includes her deposition testimony that she uses the term "possible allele" for indicators found during the course of her DNA testing process that resemble alleles[4] but were too faint and unreliable to include in the results of her report. PCR Ex. GGG; PCR Ex. III at 38, 78. Throughout her testimony, Tobey repeatedly informed trial counsel that she could not draw conclusions from possible alleles. PCR Ex. III at 40-41, 58, 66.

On appeal, the Court of Appeals of Indiana found that trial counsel's performance was not deficient because his decisions to focus on implicating Green and to limit his impeachment efforts were strategic. ECF 9-11 at 10-15. The appellate court further found no prejudice given the overwhelming nature of the evidence. *Id.* It also noted the reasoning of the St. Joseph Circuit Court, which found that Giger did not meet his burden with respect to prejudice because he did not address what would have

---

[4] An allele is "any one of a series of two or more different genes that may occupy the same locus on a specific chromosome." STEDMANS MEDICAL DICTIONARY 22750.

happened if trial counsel had asked the questions or made the objections suggested by Giger. *Id.*

 After reviewing the record, the court cannot find that the State court's determination regarding the investigation and cross-examination of Husband, Green, Stewart, Vanison, and Tobey was error. As noted by the State courts, many of Giger's suggestions are trivial and would not have meaningfully advanced his defense. For instance, it is unclear how Giger would have benefited from trial counsel impeaching Husband by showing that the garage did not have holes in the wall given that Husband could have overhead his conversation with the victim with or without such holes. It is also unclear why Giger suggests that trial counsel should not have agreed to the Stewart stipulation given that, even now, Giger does not dispute the material fact that he and Stewart were housed in the same location at the St. Joseph County Jail for four weeks. Similarly, Tobey heavily downplayed the significance of "possible alleles," so it seems unlikely that further questioning on that topic would have been beneficial to Giger.

 Other suggestions would have been futile; for example, trial counsel could not have successfully objected to Husband's unquestionably true statement of fact that "[w]hen they investigated, the evidence was there" on the basis that it was a legal conclusion, and Judge Frese would not have allowed Green's conviction or the newspaper article regarding Giger's case to come into evidence. For other suggestions still, the extent of their effect is unclear because Giger did not investigate it during State post-conviction proceedings and thus did not satisfy his burden of proof with respect to

prejudice. For instance, the suggestion that trial counsel should have questioned Husband regarding her cousin's arrest is a reasonable one, but the record lacks any evidence to suggest that such questioning would have produced material information. Therefore, the argument that trial counsel failed to adequately investigate and cross-examine witnesses is not a basis for habeas relief.

Police Interview

Giger argues that he is entitled to habeas relief because trial counsel provided ineffective assistance with respect to his interview with the police. He argues that trial counsel should have sought redaction of the police interviewers' statements or an instruction informing the jury that the statements were not evidence.

At trial, the trial court admitted a video recording and a transcript of Giger's interview with the police into the record. During the interview, the police expressed skepticism of Giger's narrative on numerous occasions, including:

> How is it that something that seems to be the most important part of this, the goddamn murder weapon, and you don't remember to tell us! How is it that important piece of evidence, that important piece of information you forgot to tell us! You see what I'm saying? How are we supposed to sell this story to somebody and believe your story when the most important things about this, you left out!

> You know what I see, you think I want to sell this story to somebody else! I'll tell you what story I'm gonna sell to you, you put yourself in this, and I ain't got… I'm convinced that you ain't telling me the truth. Okay. You didn't take nothing but the keys out of his pocket but the money laying up on the god damn dresser's got blood all over it for Christ sakes.

> This is a hard one man. Serious, I want to believe you. I really do. But it's just not adding up.

Trial Ex. 108.

At the post-conviction stage, trial counsel testified that he believed that the police statements were standard interrogation techniques and that Giger's steadfast denials in response to these statements bolstered his credibility. PCR Tr. 467. The appellate court found that trial counsel's decision to allow the police statements was a reasonable strategy. ECF 9-11 at 17-20. It further concluded that the failure to request a limiting instruction was not prejudicial because the police statements merely challenged Giger's credibility or were consistent with other evidence at trial, including Husband's testimony and the presence of blood. *Id.*

After reviewing the record, the court cannot find that the State court's determination regarding the police statements was objectively unreasonable. The interview transcript reveals that Giger maintained his innocence under significant police scrutiny, and it was thus reasonable for trial counsel to believe that the police statements would bolster Giger's credibility. Giger suggests that trial counsel's strategy wrongly assumed that the jury knew that the police statements were not evidence of guilt. While the jury may not have had a comprehensive understanding of State evidentiary rules, they heard substantial testimony regarding the investigation. Consequently, it would be reasonable to assume that a jury would understand the context of police statements, including the scope of the officers' personal knowledge, their reliance on circumstantial evidence, and the general purpose of the police interview, which occurred shortly after Giger's arrest. Moreover, it is unclear how such statements could have prejudiced Giger given that the prosecution made many of the same arguments based on the same evidence and that the trial itself presupposed the

23

investigators' belief that Giger had committed the crime and had lied during his interview. Therefore, the claim trial counsel should have redacted or submitted a limiting instruction on the police statements is not a basis for habeas relief.

<u>Jury Instructions</u>

Giger argues that he is entitled to habeas relief because trial counsel failed to object to the trial court's jury instructions on circumstantial evidence and on witness credibility. At trial, the trial court issued jury instructions on these issues that deviated from the Indiana pattern jury instructions. On circumstantial evidence, the trial court instructed:

> Circumstantial evidence means evidence that proves a fact from which an inference of the existence of another fact may be drawn. An inference is a deduction of fact that may logically and reasonably be drawn from another fact or group of facts. You are entitled to draw reasonable inferences from the evidence. It is not necessary that facts be proved by direct evidence. Both direct evidence and circumstantial evidence are acceptable as a means of proof. The State is not required to prove the essential elements of murder by eyewitness observation. Circumstantial evidence may establish the guilt of the defendant beyond a reasonable doubt. However, in a case such as this where the evidence is entirely circumstantial, in order to convict, such circumstantial evidence must be so conclusive [in] character and point so surely and unerringly to the guilt of the accused as to exclude every reasonable hypothesis of innocence.

Trial Tr. 1378.

> On witness credibility, the trial court stated:

> You are the only judges of the weight of both the physical evidence and the testimony—believability, or "credibility"—of each of the witnesses. In considering the testimony of a witness—including the testimony of the defendant, who is a competent witness in his own behalf—you may take into account the witness's ability and opportunity to observe those things he or she testified to, the witness's memory, manner and conduct while testifying, any interest the witness may have in this case, any bias the

witness may have for or against any party to this suit, any relationship with other witnesses or interested parties, and the reasonableness of the witness's testimony when viewed with all of the other evidence in the case. The credibility of the defendant's testimony should be evaluated by you according to the same criteria that you use for any other witness. You should try to fit the evidence to the presumption that the defendant is innocent. Each witness in a trial takes an oath to testify truthfully. Therefore, you should not disregard the testimony of any witness without a reason, and then only after careful consideration. The testimony of a witness does not have to be corroborated by other evidence for you to believe that witness. However, if you find so much conflict between the testimony of two or more witnesses that you cannot believe each of them, then you must decide which witnesses you will believe and which you will disbelieve. Or, if you decide that any witness's testimony is so unreasonable as to be unworthy of belief, you may disbelieve that witness.

Furthermore, you should evaluate the testimony of each witness in light of all relevant physical evidence, and the reasonable inferences drawn from such physical evidence. If you have drawn reasonable conclusions about the physical evidence that prove inconsistent with the testimony of any witness, then you should reconsider both the physical evidence and that witness's testimony in order to resolve such apparent inconsistency. In other words, you must decide in such a case whether your conclusions drawn from the physical evidence are invalid, or whether you disbelieve the witness, or whether you are unable to draw any conclusion.

In weighing the evidence to determine what or whom you will believe, you should use your own knowledge, experience and common sense gained from day to day living. You may find that your determination of the truth is not controlled by the number of witnesses who testify to a particular fact, or on one side or the other, or the quantity of evidence on a particular point. You should give the greatest weight to that evidence which convinces you most strongly of its truthfulness.

*Id.* at 1378-81.

At the post-conviction stage, Judge Frese prevented post-conviction counsel from questioning trial counsel regarding the jury instructions. PCR Tr. 472-73. He reasoned that the jury instructions spoke for themselves and that their adequacy was a matter of law. *Id.* On appeal, the Court of Appeals of Indiana found no deficient performance or

prejudice, reasoning that the instructions merely expounded on the concepts of circumstantial evidence and evidence weighing and that there was no indication that they misstated the law or affected the outcome. ECF 9-11 at 21-24.

After reviewing the record, the court cannot find that the State court made an unreasonable determination with respect to the jury instructions. Giger argues that the trial court overemphasized the jury's ability to convict him based on circumstantial evidence. However, even if the trial court was excessive in this regard, the final sentence of the instruction countered any potential prejudice by emphasizing that the evidentiary standard to convict based on circumstantial evidence remained quite high. Giger further argues that the instruction on witness credibility did not allow the jurors to both acknowledge that the inculpatory nature of the physical evidence and credit Giger's testimony. This argument is based on a misinterpretation of the instruction, which broadly asks the jury to recognize conflicts between physical evidence and testimony and to resolve them if possible. Under this instruction, the jury could have found that there was no significant conflict between the physical evidence and Giger's testimony as trial counsel argued at closing or that there was such a conflict but that their initial beliefs regarding the incriminating nature of the physical evidence were erroneous. Therefore, the argument regarding the jury instruction is not a basis for habeas relief.

<u>Cumulative Error</u>

Giger argues that he is entitled to habeas relief due to the cumulative nature of trial counsel's errors. "Trial errors which in isolation are harmless might, when

aggregated, alter the course of a trial so as to violate a petitioner's right to due process of law." *Alvarez v. Boyd*, 225 F.3d 820, 824 (7th Cir. 2000) "The cumulative effect of two or more individually harmless errors has the potential to prejudice a defendant to the same extent as a single reversible error." *Id.* "To prevent the synergistic effect of these errors from escaping review, courts attempt to determine whether the whole is greater than the sum of its parts." *Id.* "The cumulative effect analysis requires a petitioner to establish two elements: (1) at least two errors were committed in the course of the trial; (2) considered together, along with the entire record, the multiple errors so infected the jury's deliberation that they denied the petitioner a fundamentally fair trial." *Id.*

At the post-conviction stage, the appellate court considered the cumulative effect argument and found that, "[f]or the most part, however, Giger had failed to demonstrate that his trial counsel's performance was deficient." ECF 9-11 at 28. It further found that, "given the overwhelming evidence against Giger, any alleged deficiency did not result in prejudice to Giger." *Id.* The court agrees on both points. As discussed above, the court cannot find that the State court's determination regarding trial counsel's performance was unreasonable.

The court also cannot find that the State court's determination that the evidence was overwhelming was unreasonable. To start, Husband's testimony established that Giger had romantic interest in her, wanted her attention on the night of the incident, but did not have the money or cocaine to pay her. It also established that Giger would not have been able to obtain crack from the victim on credit, which Griffin later confirmed. It established that Giger returned to the Husband residence with cocaine and cash with

minor injuries and a paranoid demeanor. The victim's cellphone displayed a telephone call from Giger on the night of the incident, and the victim died due to multiple stab wounds. At the Giger residence, investigators discovered a knife as well as the blood on the interior and exterior of his vehicle and on the knees of his jeans found in his bedroom. DNA testing revealed the victim's DNA on Giger's jeans and the DNA of both Giger and the victim on the knife. On the day of his police interview, Giger had blood on his shoe and blood-stained cash in his possession. Though much of this evidence is circumstantial, it is nevertheless extremely compelling.

Giger maintains that he fully explained why this evidence was not incriminating during his testimony at trial. To Giger's point, his testimony is consistent with some of the physical evidence, but there remain significant inconsistencies. The record indicates that the bulk of the attack took place on the corner of College and Sibley, including the removal of the victim's jacket and the infliction of nineteen stab wounds. The distance between the Jackson residence, near where Giger was parked, and the corner of College and Sibley was about a tenth of a mile, and the crime occurred in a residential neighborhood in the early morning. Giger testified that he saw the victim running but did not testify that he saw anyone in pursuit. He also testified that he got out of his vehicle and began running toward College. It is unclear how long he remained on the ground after he fell, but it seems highly unlikely that he would not have heard the victim as he was stabbed or caught a glimpse of the attacker under these circumstances.

Further, portions of Giger's testimony are not convincing. Considering Giger's testimony that he accompanied the victim to the Jackson residence for protection, it

seems unlikely that the victim would run away from Giger's vehicle near the front of that residence, where Giger told him he would move it. Similarly, Giger's testimony that he did not recognize the knife as the murder weapon after seeing the nearby corpse and the nature of the injuries is implausible and also contradicted by his statements to the police. Trial Ex. 108 at 19. It is also notable that Giger's reaction to discovering the violent murder of his friend was to immediately change clothes, to visit Husband, to spend time with her on her bed, to consume crack with her and her mother until nine in the morning, and then to attempt to resume spending time with Husband the following night.

As trial counsel argued, Green's connection to the events of that evening could have raised some doubt as to Giger's guilt. Green, a convicted felon, left the Jackson residence twice to buy crack that night and may have been out of the house at some unverifiable location during the time of the murder. The attack of the victim began in the backyard of the Jackson residence where he was staying. Green, unlike Giger, reported the murder to the authorities, but this fact cuts in both directions as the report is another unusual connection to the case.[5] However, when considering the record, the theory of Green as the murderer does not withstand scrutiny. For example, there no indication that Green or Johnson had ever purchased cocaine from the victim; instead, Griffin, who spent "all day every day" with the victim, testified that he did not know

---

[5] At closing, the prosecution offered the theory that Giger had given Green a ride for his first crack transaction of the night and attacked the victim in the backyard of the Jackson residence in an attempt to frame him. Trial Tr. 1304-05. While this theory would explain the victim's presence in the backyard of the Jackson residence, it is speculative as Green declined to identify Giger as the driver when the prosecution prompted him to do so at trial. *Id.* at 314-15.

Green or Johnson, and Green had just bought cocaine from another individual across town a short time before his second trip of the night. Further, when the police searched Green's home, they did not find bloody articles of clothing but instead found soiled pants consistent with his unflattering admission during his testimony. The police examined him for injuries or torn clothing consistent with the commission of the murder but found none, and the prosecution introduced photographs of his unscathed hands into the trial record. Green also lacked a compelling motive--unlike Giger, he had a girlfriend who lived with him and was on good terms with the victim and who had given him money to buy her cocaine.

Taken as a whole, the evidence presented at trial strongly pointed toward Giger as the murderer. Further, the court remains unconvinced that Giger's suggestions, in isolation or in aggregate, would have likely affected the outcome even if it were a close case. To recap, Giger suggested that trial counsel should have: impeached witnesses who testimony facilitated trial counsel's strategy and was consistent with Giger's testimony; impeached witnesses on immaterial matters; attempted to introduce evidence that the trial court would not have allowed; declined to stipulate that Stewart remained at the St. Joseph County Jail after Stewart had already reported Giger's confession; questioned an expert witness on trace results she believed to be insignificant for purposes of DNA analysis, her area of expertise; redacted or provided a limiting instruction on police statements during the Giger interview; and objected to superfluous language in the jury instructions on circumstantial evidence and witness

credibility. Considering the weight of the evidence and the absence of prejudice, the argument regarding cumulative error is not a basis for habeas relief.

POST-CONVICTION COUNSEL

Giger asserts that his procedurally defaulted claims regarding trial counsel's failure to challenge false evidence and to timely depose witnesses are excused due to the ineffective assistance of post-conviction counsel, citing *Martinez v. Ryan*, 566 U.S. 1 (2012). In that case, the Supreme Court of the United States held, "Where, under state law, claims of ineffective assistance of trial counsel must be raised in an initial-review collateral proceeding, a procedural default will not bar a federal habeas court from hearing a substantial claim of ineffective assistance at trial if, in the initial-review collateral proceeding, there was no counsel or counsel in that proceeding was ineffective." *Id.* at 11.

Search Warrant

Giger asserts that post-conviction counsel should have argued that trial counsel was ineffective for failing to challenge the search of his residence, which he alleges would have resulted in the exclusion of incriminating evidence. He alleges that Sergeant Ciesiolka falsely attested that his mother consented to a search of his home, relying solely on an affidavit from his deceased mother.[6] ECF 38-1 at 60-61, 63. A criminal defendant may challenge a probable cause determination on the basis that it includes "allegations of deliberate falsehood or of reckless disregard for the truth," but

---

[6] According to the local newspaper, Giger's mother died on September 5, 2007. *Clara Lee Giger-Davis*, South Bend Tribune, Sept. 12, 2007, at E3.

may not proceed on that challenge "if, when material that is the subject of the alleged falsity or reckless disregard is set to one side, there remains sufficient content in the warrant affidavit to support a finding of probable cause." *Franks v. Delaware*, 438 U.S. 154, 171–72 (U.S. 1978).

According to the probable cause affidavit, Sergeant Ciesolka entered the Giger residence at Giger's mother's invitation, where he questioned her and observed the knife that was later determined to be the murder weapon. ECF 38-1 at 60-61. Based on this probable cause affidavit, the St. Joseph Circuit Court issued a search warrant, and the police seized evidence from the residence, including the knife and Giger's blood-stained jeans. Trial Tr. 569-72. On February 6, 2006, Giger's mother signed an affidavit, attesting that:

> 1. On 2-2-02, four men identifying themselves as South Bend Police Officers came to my home, located at 1613 Florence Street, in South Bend, asking to speak to my son Moses Giger.
>
> 2. When I told the officers Moses was not home, he was in Chicago; the officers asked me if they could come in and ask me a few questions.
>
> 3. The officers asked me where Moses resided in the home, I told them Moses had his own private area upstairs and I never go up there.
>
> 4. While the officers were asking me questions about events which took place the night before at least two of the police officers entered the upstairs area without my permission.
>
> 5. Officers walked around my home looking into things, including the washing machine located in the kitchen.
>
> 6. At no time on the [sic] 2-2-02, did I give police permission to search my home, which they did.

ECF 38-1 at 63.

While the affidavit suggests that police officers may have conducted an unlawful search, it does not establish that the jeans or the knife should have been excluded from trial, even accepting its attestations as true. To start, the affidavit indicates that Giger's mother consented to the entry of the home for the purpose of questioning. Sergeant Ciesolka observed the knife in plain view during the course of this questioning, so no unlawful search occurred to this point. *See Horton v. California*, 496 U.S. 128, 133 (U.S. 1990) ("If an article is already in plain view, neither its observation nor its seizure would involve any invasion of privacy."). The police officers may have exceeded the scope of consent by searching around the house, but the affidavit lacks sufficient detail regarding the exchange between Giger's mother and the police for meaningful assessment of this issue. *See United States v. Thurman*, 889 F.3d 356, 368 (7th Cir. 2018) ("Whether a search extends beyond the scope of consent is a question of fact to be determined from the totality of all the circumstances."). Moreover, even if the police exceeded the scope of consent by searching other areas of the house, there is no indication that they found any evidence that could have been excluded and affected the outcome of trial.

At base, further assistance from Giger's mother would have been required for post-conviction counsel to effectively pursue this claim. However, post-conviction counsel entered this case only after Giger's mother's death in October 2007 and thus had no opportunity to interview Giger's mother or to present Giger's mother at the evidentiary hearings, which took place in 2015 and 2016. ECF 9-8 at 10. Because

pursuing this claim would have been futile without assistance from Giger's mother, the court finds that post-conviction counsel was not ineffective for declining to do so.

Giger also argues that, in the same affidavit, Sergeant Cielsiolka falsely stated that he found a bloody knife in the Giger residence. The record reflects that the knife was not bloody, but the affidavit is rife with other facts that would support a probable cause finding. Specifically, Sergeant Cieslioka attested that he observed the victim who had apparently died of numerous stab wounds. *Id.* at 60-61. Near the time of his death, the victim had received a telephone call from the Giger residence, which was near the scene of the crime. *Id.* Sergeant Ciesiolka attested that he saw blood on the exterior of the door of the vehicle in Giger's driveway and blood on the exterior of the door of his residence. *Id.* He further attested that Giger's mother told him that Giger was the last person to drive the vehicle and that he saw a knife (even if it was not bloody) laying on a table in the residence. *Id.* These facts, by themselves, would be sufficient to support a probable cause finding. In sum, Giger has not demonstrated that his post-conviction counsel was ineffective for declining to raise this claim, but, even if the court excused procedural default on that basis, Giger could not demonstrate a lack of probable cause.

### Police Misconduct

Giger asserts that post-conviction counsel should have argued that trial counsel was ineffective for failing to investigate whether the police intended to frame him. He alleges that he told trial counsel that he heard police officers say that they intended to "railroad Giger's ass all the way to prison" during a break in his interview. He maintains that this failure to investigate allowed the police to engage in systemic fraud

in numerous respects. First, he alleges that the police tampered with the blood on the jeans found in his residence under the search warrant. He highlights the discrepancy between the investigator's description of blood only on the knees and the serologist's more expansive findings of blood on the legs, seat, and waist. This discrepancy is resolved by a cursory look at the photograph exhibits of jeans, where the knees are the only location where blood is clearly visible to the naked eye, and by recognizing the serologist's expertise and use of scientific techniques in identifying the presence of blood. *See* Trial Tr. 798-800, 821-23; Trial Ex. 99, 100, 101, 102.

Giger further maintains that, "[d]uring the interview Giger was emphatic that the blood evidence on the knee of his pants was from him falling down twice" and that the serologist's findings were inconsistent with this narrative. However, Giger greatly mischaracterizes his narrative during the interview, when he said, "I had blood all over me," represented that he had blood on him "from trying to see what was wrong with [the victim]," and only discussed falling down once to explain the blood on his clothes after he had gone home and changed. Trial Ex. 108 at 9, 21, 23. At base, there is no discrepancy between the investigator's description, the serologist's findings, and Giger's narrative that would suggest police misconduct.

Giger asserts that Sergeant Ciesolka's testimony regarding the bloody knife at the Giger residence is also evidence of the intent to frame him. Sergeant Ciesolka testified that, after he had entered the Giger residence, he saw "a knife, a large knife sitting on the table two feet from [him] that [appeared] to have blood stains on it." Trial Tr. 1007. He later clarified that he had never picked the knife up to examine it or

35

otherwise. *Id.* at 1009. The serologist, photograph exhibits, and the prosecution's closing argument undermined Sergeant Ciesolka testimony regarding the visible presence of blood on the knife. *Id.* at 843, 1363; Trial Ex. 9, 80. This testimony was thoroughly discredited, and it was also immaterial given that DNA analysis revealed the presence of DNA on the knife from both Giger and the victim, so it is unclear what prejudice Giger suffered as a result of it. Consequently, the court cannot fault post-conviction counsel for declining to pursue this line of inquiry.

Giger further asserts that the prosecution tampered with the jail logs to show that he and Stewart were housed in the same location in the St. Joseph County Jail, which allowed Stewart to testify as follows:

> **Trial Court:** Okay, now, what I want to know is this stipulation says from March 12 to April 10, you and Mr. Giger were in the same jail location.
>
> **Stewart:** We was in the same pod and the same bunks you know.
>
> **Trial Court:** And people can freely go between and talk to everybody in their section of the pod?
>
> **Stewart:** Yes.

Trial Tr. 1173.

Significantly, the jail logs were not admitted at trial, and the court is unconvinced that the prosecution would tamper with jail logs merely to prevent trial counsel from impeaching Stewart's testimony in response to the trial court's questions. Giger specifically objects to the implication that he and Stewart shared the same cell, which he denies, but whether the two inmates shared the same cell or whether they shared the same pod in an arrangement that permitted a similar level of inmate socialization is not

particularly material to assessing Stewart's credibility. Moreover, to the extent that the

stipulation and Stewart's testimony implied that he and Giger shared the same cell,

Giger clarified it in his testimony, which the prosecution did not challenge:

> **Trial Counsel:** Do you know Mario Stewart?
>
> **Giger:** Vaguely. He was in the same pod I was in.
>
> **Trial Counsel:** All right. By pod, what do you mean?
>
> **Giger:** There are twenty-four people in a pod. Well, one pod can accommodate twenty-four people. Usually, there's twenty-four people in our pod.

Trial Tr. 1242. In sum, the allegations regarding police misconduct are unsupported

and, even assuming that they could be proven, such misconduct would have had little,

if any, effect on the jury verdict. The court cannot fault post-conviction counsel for

declining to pursue this claim and thus finds that the *Martinez* exception does not

excuse its procedural default.

Depositions

Giger argues that post-conviction counsel should have argued that trial counsel

was ineffective for deposing witnesses two weeks before trial and not receiving

transcripts until the day of trial. He maintains that this lack of preparation caused trial

counsel to provide ineffective assistance in several ways, including failing to investigate

witnesses, failing to investigate police misconduct, and failing to object to tainted

evidence. This claim is too broad for meaningful analysis, though the court has

addressed Giger's more specific claims in the same vein above. Given the unwieldy

breadth of this claim and its redundancy with other claims, the court cannot fault post-conviction counsel for declining to pursue it and thus finds that the *Martinez* exception does not excuse its procedural default.

CERTIFICATE OF APPEALABILITY

Pursuant to Section 2254 Habeas Corpus Rule 11, the court must grant or deny a certificate of appealability. To obtain a certificate of appealability under 28 U.S.C. § 2253(c), the petitioner must make a substantial showing of the denial of a constitutional right by establishing "that a reasonable jurist could debate whether (or, for that matter, agree that) the petition should have been resolved in a different manner or that the issues presented were adequate to deserve encouragement to proceed further." *Slack v. McDaniel*, 529 U.S. 473, 484 (2000).  For the reasons explained in this order, there is no basis for encouraging Giger to proceed further.

For these reasons, the court DENIES the habeas corpus petition; DENIES a certificate of appealability pursuant to Section 2254 Habeas Corpus Rule 11; and DIRECTS the clerk to enter judgment in favor of the Respondent and against the Petitioner.

SO ORDERED on July 20, 2020

/s/ JON E. DEGUILIO
CHIEF JUDGE
UNITED STATES DISTRICT COURT